Aaron (a slave) v. The State.

Judgment reversed, and cause remanded. The prisoner must remain in custody, until discharged by due course of law.

AARON (A SLAVE) vs. THE STATE.

[INDICTMENT AGAINST SLAVE FOR MURDER OF WHITE PERSON.]

1. *Competency of juror.*—A mere occupant and tenant, under a yearly letting, of a room used by him as a sleeping apartment, is not a *freeholder*, within the meaning of the statute (Code, § 3583) specifying the grounds of challenge to jurors in criminal cases.

2. *Admissibility of confessions.*—The constable who had the custody of the prisoner, a slave, having said to him, "If you did it, you had better confess: it would be best for you to tell the truth; truth is always the best policy; but, if you did not kill him, we don't want you to say so,"—*held*, that there was nothing in these facts to show that the prisoner's confessions, subsequently made to the constable in the same conversation, were elicited through the influence of either hope or fear; and that the confessions were admissible evidence.

3. *Organization of grand jury; sufficiency of certified transcript on change of venue*—Where the regular term of the circuit court commenced on the second Monday after the fourth Monday in October, which was the eighth day of *November;* and the indictment, as copied into the certified transcript on change of venue, purported to have been returned into court on the ninth day of *November;* while the transcript stated, in its caption, that the grand jury was organized at a term of the court begun and held on the second Monday after the fourth Monday in *November,* which was the sixth day of *December,*—*held*, that the transcript did not show that the grand jury was organized at the regular term of the court; but, if a wrong date was inserted in the transcript by a clerical misprision, (there being a reversal of the judgment on other grounds,) the mistake may be corrected before another trial.

4. *Variance in name of deceased.*—Where the indictment alleged the name of the deceased to be Louis *Boudet* or *Boredet,* while his real name was proved to be Louis *Burdet,* and to be sometimes pronounced as if spelt *Bouredet;* and the circuit court thereupon charged the jury, "that if this real name was the same in sound as if written *Boudet* or *Boredet,* or so nearly the same that the difference would be but slight, or scarcely perceptible, and he would have been readily known by his name being pronounced as if written *Boudet* or *Boredet,* then the variance would not avail the defendant,"—*held*, that the ruling of the court was substantially correct.

Aaron (a slave) v. The State.

From the Circuit Court of Mobile, on change of venue from Baldwin.

Tried before the Hon. C. W. RAPIER.

THE prisoner was indicted, jointly with another slave, in the circuit court of Baldwin, for the murder of one Louis Boudet, (or Boredet, as the court decided, on inspection, it might be,) a white man.  The venue having been changed to Mobile, the prisoner was there tried alone, at the December term, 1860.  During the organization of the jury, as is shown by the bill of exceptions, A. R. Drish, one of the regular panel of jurors, being examined touching his qualifications as a juror, "stated, that he was not a freeholder; but that he rented a room by the year, and occupied it as a lodging-room; and that he exercised the exclusive control of said room, and had occupied it thus for more than a year."  The prisoner challenged this juror, on the ground that he was neither a freeholder nor a householder; the court overruled the objection, and the prisoner excepted.  An exception was also reserved to the ruling of the court in admitting one Hannibal Choate as a competent juror, on a similar state of facts; and several other exceptions, which require no particular notice, were reserved during the organization of the jury.

When the State offered to read to the jury the copy of the indictment contained in the certified transcript, "the prisoner objected to being put upon his trial on said copy-indictment, and objected to the same being read to the jury as a sufficient indictment, and objected to the introduction of said transcript; because said transcript showed that the court commenced its session at a time not appointed for a regular term; and because it contained no caption showing the organization of a grand jury at the regular term of said court; and because it did not appear that said indictment was found at a regular term of said court; and because it appeared that said indictment was filed in court before the organization of the grand jury."  The transcript states,

in its caption, that the proceedings were had "at a term of
the circuit court, begun and held in and for the county of
Baldwin, at the court-house thereof, on the second Monday
after the fourth Monday of November, 1858;" and then
sets out the organization of the grand jury. The next
minute-entry, which is headed, "Tuesday, November 9,
1858," recites that the grand jury return into court, and
file sundry bills of indictment; and then follows the indict-
ment against the prisoner, which is entitled 'Fall term,
1858,' and endorsed by the clerk, 'Filed in open court, 9th
November, 1858.' The court overruled the several objec-
tions to the indictment and transcript, and the prisoner
excepted.

The deceased was killed on the 20th or 21st April, 1858.
The prisoner was at that time a runaway, and did not
return home for several days afterwards. When he re-
turned, (suspicion having been aroused in the meantime
against him and another slave, Ranty by name,) he was
seized and tied by his overseer, and delivered up to a
magistrate, by whom he was examined touching the mur-
der of the deceased; but on that examination he denied
all participation in the killing. He was left, during the
night, in the custody of one Nelson, who was acting as
constable, and who kept him bound with handcuffs and a
chain.    On the next morning, while Nelson, accompanied
by several other persons, was carrying him to the place
appointed by the magistrate for the further investigation,
and while he and Nelson were twenty or thirty yards in
advance of the rest of the party, he made a confession of
his guilt; and immediately afterwards, while the whole
party were going down the river in a boat, repeated the
confession in the presence of the other persons. One of
the handcuffs had swollen his wrist, and Nelson took it off;
but it does not appear whether this was before or after the
first confession. The State first introduced one Eslava as a
witness, who was one of the party with the constable on
that occasion, and who testified that, "on the morning of
the next day after Aaron's first examination, while going

down the river in a boat, with him and several other persons, Aaron made a statement to him, about the killing of the deceased, implicating himself; and that this statement was made in reply to a question by him, 'how he came to tell about the matter,' alluding to his confession, just before, to Nelson. The solicitor asked the witness, whether he held out any inducement to the prisoner to confess, or used any threats, force, or undue influence; and the witness said, that he had not. The solicitor then asked the witness to state what the prisoner said to him; but the prisoner, by his counsel, objected to this, because it did not appear that, at the time this confession was made, the influence of the oath and charge given to him had been removed. The court overruled the objection, and the prisoner excepted." The prisoner then introduced Nelson as a witness, who testified to the court, in reference to the confession made to him, as follows: "While he and Aaron were about twenty-five or thirty yards in advance of the others, and were in conversation about the matter of the homicide, witness said to Aaron in substance, as well as he could recollect, 'If you did it, you had better confess : it is best to tell the truth; but, if you did not do it, we don't want you to say so.' On re-examination touching this conversation, the witness stated that he said to the prisoner, 'If you killed him, you had better confess; it would be best for you to tell the truth; truth is always the best policy. But, if you did not kill him, we don't want you to say so; if you did, it is best for you to confess and acknowledge it.' When witness made these statements to Aaron in said conversation, Aaron walked on a little way, saying nothing, and apparently reflecting, and then made the confession. No one else was then present, but the others soon came up." The prisoner then introduced as witnesses, before the court, the agent of his owner, who had the control and management of him, and his overseer; who testified to the facts above stated, in reference to his being a runaway at the time the homicide was committed, his return home, his arrest by the overseer, and his delivery to the magistrate.

On these facts, the court admitted as evidence to the jury, against the prisoner's objections, the confession to Eslava, and the prior confession to Nelson; to which decisions the prisoner reserved exceptions. The State then adduced evidence corroborating the confessions in several particulars.

In reference to the name of the deceased, the testimony was as follows : Eslava testified, "that the deceased was a Swiss, and was named Louis *Burdet;* that he spoke French, and pronounced his name according to the French pronunciation ; that he (witness) had seen the deceased write his name, and pronounced it as the deceased did." Joseph Nelson testified, "that he knew the deceased, who was generally called Louis *Burdet,* pronouncing the surname as in English." Mr. Weeks testified, "that he knew the deceased, and that his name was Louis *Burdet,* giving the French pronunciation." Joseph Hall testified, "that he knew the deceased, who was generally called by his christian name, Louis ; that he had several times heard his name called out at the polls where he voted, and that it was then pronounced, to the best of his recollection, as if written *Bouredet* according to English orthography ; that he did not know what was the correct pronunciation of his name, because he was generally called 'Old Louis.'" The court decided, on inspection, aided by the testimony of several experts, that the name, as written in the indictment, might be either *Boudet,* or *Boredet,* and might be pronounced as if spelt *Boodet,* or *Bowdet;* and instructed the jury, "that if the real name of the deceased was the same in sound as if written *Boudet* or *Boredet,* or so nearly the same that the difference would be but slight, or scarcely perceptible, and he would have been readily known by his name being pronounced as if written *Boudet* or *Boredet,*—then the variance would not avail the defendant for his acquittal ;" to which charge the prisoner excepted.

JAMES BOND, and L. S. LÜDE, for the prisoner.—1. Drish and Choate were not competent jurors, being neither freeholders nor householders.—Code, §§ 3486, 3583. The

object of the statute, in requiring householders and free-holders as jurors, is recited to be the securing of "honesty, impartiality, and intelligence ;" and its purpose will inevitably fail, at least in the cities and large towns, if the mere renting of a room be held sufficient to constitute a householder. Where rooms are rented by gamblers and other disreputable characters, such renting gives not the slightest assurance of honesty or intelligence. To effectuate the object of the statute, the term *householder* should be construed to mean, one who holds, or has possession of a house—who has some stake in the community, and whose reputation may be known. If the prisoner was tried by jurors who had not the requisite qualifications, the judgment will be reversed.—1 Porter, 298 ; 2 Mason, 91 ; 1 Johns. 315 ; 8 Johns. 347 ; 8 Ala. 302 ; 4 Barn. & Ald. 472 ; 3 Iredell, 532.

2. The certified transcript, on which the prisoner was tried, was fatally defective. The regular fall term, 1858, of the circuit court of Baldwin, commenced on the 8th day of November, as this court must judicially know ; yet the transcript states, that the grand jury was organized on the 2d Monday after 4th Monday in November. If this statement is true, the indictment was not found by that grand jury, or the grand jury itself was organized at an unauthorized time.

3. The prisoner's confessions ought not to have been admitted as evidence against him. The circumstances under which those confessions were made, as detailed in the bill of exceptions, show that they were extorted from him by the two-fold influence of hope and fear. The prisoner is a slave, ignorant of the law, and accustomed to implicit obedience. The confessions were made to a white man, an officer of the law, in whose custody he was, and in response to a question by that officer ; and at a time, too, when he was bound in irons, and in the midst of an excited party of white men who were investigating the facts of the homicide. If he had failed to answer the question, his silence would have been considered disrespectful ; and if he had

given the same answer as on his former examination, it would not have been accepted as satisfactory. The officer did not caution him that what he said would· be used as evidence against him, nor can he be presumed to know that fact. The remarks of the officer, in reply to which the first confession was made, could only be construed by him as a threat, if he did not confess, or a promise that he could thereby better his condition. His former denial was not satisfactory to the party, and he must have seen that nothing short of a confession of his guilt would satisfy them. If these facts are not sufficient to show, affirmatively, that the confessions were not voluntary, they at least raise grave doubts of their entire freedom.—*State v. Long,* 1 Hayw. 455 ; Wharton's Amer. Crim. Law, 252 ; 1 Greenl. Ev. § 225, and notes ; 32 Ala. 566 ; 26 Ala. 107 ; 25 Ala. 1. An additional ground of objection, which is, of itself, sufficient to exclude the confessions, is the fact that the prisoner had been previously sworn and examined during the investigation, and was then charged by the magistrate, as the statute directs, (Code, §§ 3318, 3315,) concerning the consequences and punishment of false swearing ; and it was not shown that, at the time the confessions were made, the influence and effect of this oath and charge had been removed from his mind ; on the contrary, the confession itself shows that they still dwelt upon his mind. Confessions have been repeatedly excluded, because the prisoner had been examined upon oath.—1 Greenl. Ev. § 225 ; Bull. N. P. 242 ; 4 Hawk. P. C. ch. 46, § 37 ; 4 C. & P. 564 ; 6 *ib.* 161, 179 ; 1 Moody & Rob. 297 ; 1 Moody, 203 ; 1 Parker's Crim. R. 406–23 ; 4 Dallas, 116 ; 1 Phil. Ev. 113, note 207, 2d vol. ; Roscoe, 48–50.

4. The charge of the court to the jury, on the question of variance, was erroneous. The rule of law as to *idem sonans* cannot apply to names so dissimilar in sound as *Burdet* and *Boudet,* or *Boredet.*—*Rex. v. Tannet,* Russ. & R. 351 ; 10 East, 83 ; 5 Taunton, 14 ; Roscoe, 106. *Idem sonans* is a question of law, and the court erred in referring its decision to the jury.

M. A. BALDWIN, Attorney-General, *contra.*—1. Drish and Choate were householders, within the spirit and intention of the statute.

2. The objection taken to the certified transcript is but a clerical misprision, which was amendable by the other parts of the record.

3. The prisoner's confessions appear to have been made voluntarily, and were abundantly corroborated. That they were admissible, see *Hawkins v. State,* 7 Missouri, 190; Roscoe's Crim. Ev. 42.

4. There was no variance in the name of the deceased. 17 Ala. 179.

STONE, J.—The jurors Drish and Choate were mere tenants and occupants, by yearly letting, of rooms used as sleeping apartments. The section of the Code which defines the qualifications of jurors, declares that it is a good ground of challenge for either party, "that the juror has not been a resident householder or freeholder of the county, for one year preceding the time he is sworn."—§ 3583. The term "householder" is defined by Mr. Webster to mean, "the master or chief of a family; one who keeps house with his family." "Household: those who dwell under the same roof, and compose a family." In the case of *Brown v. Witt,* (19 Wend. 475,) Bronson, J., said, "The word *householder,* in this statute, means the head, master, or person who has the charge of, and provides for a family." "A person having and providing for a household, is a householder."—*Griffin v. Sutherland,* 14 Barb. Sup. Ct. 456. See, also, *Rex v. Inhabitants of Rufford,* 8. Mod. 40; *Slade's bail,* 1 Chitty, 502; *Rex v. Poynder,* 1 B. & Cress. 178; 3 Petersdorff's Abr. 103. Householder, in our statute, means something more than the mere occupant of a room or house. It implies in its term the idea of a domestic establishment—of the management of a household.—*Sallee v. Waters,* 17 Ala. 482; *Boykin v. Edwards,* 21 Ala. 261; 2 Mart. La. 313; Burrill's Law Dictionary, "Household." Under this rule, Messrs. Drish and Choate were not compe-

8

tent jurors; and for the error in putting them upon the prisoner, this case must be reversed.

The questions as to the other two jurors will probably not arise again in the present form.

[2.] Much has been written on the question, what degree of influence will exclude the evidence of confessions in criminal cases? The authorities agree that, before any confession can be received in evidence in a criminal case, it must be shown that it was voluntary. "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind, by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected."—1 Greenl. Ev. § 219; *Mose v. The State*, 33 Ala. 211; Roscoe's Cr. Ev. 39; *Wyatt v. The State*, 26 Ala. 9; *Brister v. The State*, 26 Ala. 107, 128; *Seaborn v. The State*, 20 Ala. 15; *Reg. v. Waringham*, 2 Lead. Cr. Cas. 167; 2 Russ. on Crimes, 827. See, also, 2 Lead. Cr. Cas. 190, 191, and 198, *et seq*.

In some cases, we think the rule which excludes confessions, as being procured by hopes held out, or fears excited, has been carried to the verge of propriety, if not beyond it. In *Reg. v. Drew*, (8 C. & P.,) the language used was, "Do not say anything to prejudice yourself, as what you say I will take down, and it will be used for or against you at the trial." We confess we cannot perceive on what principle this confession was excluded. So, in the case of *Reg. v. Morton*, (2 Mood. & Rob. 514,) where the language was, "What you are charged with is a very heavy offense, and you must be very careful in making any statement to me or any body else, that may tend to injure you; but anything you can say in your defense, we shall be ready to hear, or send to assist you." In each of these cases, the decision was pronounced by Coleridge, J. In the case of *Rex v. Upchurch*, (1 Moody, 465,) a hope was held out to

the prisoner, that a confession would perhaps save her neck ; and we think the ten judges—Lord Denman, Ch. J. Tindal, Lord Abinger, Ch. B. Park, and others—rightly ruled her confessions inadmissible.

Although we fully approve the sentiments expressed by this court in the case of *Wyatt, supra,* that, " in considering questions of the kind before us, we must bear in mind the dependent relation of the slave—the absolute dominion under which he lives,'" (see, also, *Clarissa's* case, 11 Ala. 60,)—yet, we agree with Parke, B., " that cases on this subject have gone quite far enough, and ought not to be extended."—*Reg. v. Moore,* 12 Eng. Law and Eq. 586. In *Seaborn's* case, the confession was made to the committing magistrate, after he had told the prisoner, (a slave and in custody,) that it was a bad business, or bad situation he was in.—20 Ala. 15. The confession was held admissible. See, also, *Reg. v. Baldry,* 2. Lead. Cr. Cases, 164 ; *Hawkins v. The State,* 7 Missouri, 190.

The substance of what the bailiff said to the prisoner in this case was, that truth was the best policy ; that if he did the act, it was best to confess it; but, if he did not do the act, then there was no wish he should say so. Now; if there be in this language any inducement offered to the prisoner to obtain a confession, that inducement was placed on the express condition that he, the prisoner, was guilty. Hence, to suppose that the prisoner was influenced by the declaration to make the confession, is to concede his guilt; for, in no other contingency, was he advised to confess. The prisoner, if innocent, was warned not to say he had done the deed, in language equally as strong as that which sought his confession if guilty. Truth was asked for ; and we cannot perceive that any hope or fear was offered to the prisoner, to induce him to make a false confession of guilt. The circuit court did not err in receiving evidence of the confessions.

[3.]. The transcript from the circuit court of Baldwin county presents the following state of facts: The regular term of the circuit court of that county sat on the second

Monday after the fourth Monday in October, and commenced its session on the 8th day of November, 1858. The indictment, on which the prisoner was tried, appears to have been returned into court on the 9th day of November, 1858. The transcript from Baldwin states, that a grand jury, composed of certain named persons, was organized in a Baldwin circuit court, on the second Monday after the fourth Monday in November, 1858, which was the sixth day of December. The transcript from Baldwin circuit court fails to show the organization of the grand jury at the fall term, 1858, unless there is a mistake in the date found in the record. We suppose the date is incorrectly stated; but, as the record before us fails to show the organization of the grand jury by whom the bill was found, and as we suppose this to be a clerical error, which can be corrected, we will do no more than call the attention of the circuit court and the parties to it, that before another trial the transcript may be put in proper form.

[4.] The ruling of the court in reference to the name of the deceased is substantially correct. We understand the circuit court to have said, in substance, that if the variance in the name be so slight as scarcely to be perceptible, and the deceased would have been readily known by the name thus called, then such variance was immaterial. In the case of *Ahitbol v. Beniditto*, the court ruled, that Benedetto was *idem sonans* with Beniditto.—2 Taunton, 401. See, also, *Ward v. The State*, 28 Ala. 60; *Doe.* ex dem. *v. Miller*, 1 B. & Ald. 699.

Judgment of the circuit court reversed, and cause remanded. Let the prisoner remain in custody, until discharged by due course of law.