# KING *vs.* THE STATE.

[INDICTMENT FOR MURDER.]

1. *Admissibility of confessions.*—The prisoner's confessions in this case were held admissible, although they were made to the officer who had him in custody, and was carrying him before an examining court, and who had said to him, "If you know anything about the

circumstances, it will be best to tell the truth about it ;" and although another officer had previously told him that his supposed accomplice had been arrested and shot, which statement was false, and was made to induce a confession. (BYRD, J., *dissenting.*)

FROM the City Court of Mobile.
Tried before the Hon. H. CHAMBERLAIN.

THE prisoner in this case, William King, (who is described in the marginal statement of the names of the parties in the minute-entries as a negro and freedman,) was indicted at the June term, 1866, jointly with one Henry Jordan, for the murder of Ashmore Edwards, "by striking him with an axe, or weapon of the like kind." On the trial, at the same term, as the bill of exceptions states, the following evidence was adduced :

" Levi H. Norton testified, in substance, that on the night of April 30th, or 1st of May, 1866, he, in company with another gentleman, arrived at Cleveland's ferry, where the deceased was engaged as ferryman, about nine o'clock; that defendant was in the flat used as a ferry-boat, and on the other side of the river ; that he hailed the boat, and defendant pulled across and put them over, leaving the deceased at his house near the ferry. Defendant then got into a buggy, with a white man whom he (witness) did not know, and started on the main road, (known as the Telegraph road,) and drove ahead of them for three-quarters of a mile, when defendant and the man with him turned to the right. Witness called to them, thinking they were strangers; and had taken the wrong road ; but they paid no attention to him. Witness lives about nine miles from the ferry. The next morning, defendant, still in company with the white man, passed witness' house. Witness stated to them, that he had called them the night before when they turned off the road. The white man who was with defendant, said that it had been a long time since he had travelled on that road. The witness stated other facts in this connection, but not material to the points reserved. John R. Davidson testified, in substance, that he lives with Mr. McKim, about two or three miles from the ferry, and to the left of the Telegraph road ; that about three, or half past

three o'clock, on the night of the murder, two men in a buggy, of whom he recognized defendant as one, drove up to the house, and, after parleying and getting directions, turned back the way they had come; that it was a bright night, and he distinctly recognized defendant as one of the men; that they betrayed unusual excitement; that the first thing he heard was an exclamation by defendant, saying, 'Jesus Christ! here is a creek'; that they were much excited, and made inquiry as to the way, and were informed they were compelled to go back into the main road. The witness gave other testimony, not material to the points reserved.

"Andrew O. Murphy testified, in substance, that on the morning of the —— day of May, 1866, he saw where the old man, the ferryman, had been murdered; saw an axe and a hatchet, covered with blood and hair; saw where he had been dragged to the river; in company with others, made preparation, and fished the body out of the river; found the skull broken, and head and face much mutilated; saw the tracks of two persons engaged in dragging the body of deceased to the river. He further testified, that he had tracked the buggy from where they left the main road, as stated by Norton; that they went down about half a mile to the right, then turned at right angles, and crossed the main road, and went back another road to the swamp near the ferry; that the buggy had been driven into a clump of bushes near the swamp; that the tracks showed that, when they left this place, it was at high rate of speed; that they were tracked around into the road to McKim's, and back again by the same road to the main road. He testified as to other matters not material to the points reserved. Ellison testified, that he lives about nine miles from the ferry, on the Telegraph road; that he got up about day-light on the morning after the murder; saw two horses tied to the bushes, and a buggy, a short distance from the house; saw defendant there, who said they got there about twelve o'clock that night; saw another man there, who was covered up with clothing, and who asked for some milk. The white man he suspected of having the small-pox, and requested them to leave his place. When

he first saw them, the horses were unhitched and unharnessed, and were feeding. He testified as to other matters not material to the point reserved.

"Wm. B. Shelton (a policeman) says, in substance, that while he had defendant under arrest, and was on the boat bringing him down the river, he had a conversation with him, in which he, Shelton, told him that Jordan (the white man) was arrested and had been shot; but stated that such was not true, and that he had done so to make King confess; that King did not confess, or make any statement at that time, but afterwards, and on another occasion, voluntarily said to witness, that the ferryman had promised him one dollar for taking over Mr. Norton, and that he went back to get it, but the old man (deceased) refused to pay it, and they had some words about it. Here the conversation was interrupted. Henry Malone (policeman) says, that he went to the jail to bring defendant before the examining court; that he took him in the buggy, when King asked him if it was true that Jordan had been arrested, saying he had heard so. Malone here attempted to narrate a confession made to him by defendant, which was objected to by defendant's counsel. Malone says, defendant remarked to him that he (King) was in a bad scrape; and that he then said to King, If you know *any thing about the circumstances, tell the truth about it, that it will be best to tell the truth about it.* The court overruled the objection, and permitted witness to narrate the confession. Witness then testified, that King said that he (King) and Mr. Jordan came back to the ferry, and that Jordan crossed over and killed Edwards (the ferryman), but that he had nothing to do with it; that Jordan had promised to give him half the money, and to pay him his wages, but had never done either. At the request of the defendant, it was admitted by the State, that King had been *bona fide* employed by Jordan to take him up the country; that Jordan has escaped from the jail of Mobile county, and was running away. It was further proved by defendant that he bore a good character as a peaceable and honest servant. It was also proved that Jordan had been arrested, but again made his escape. There was other evidence not

20

material to the question reserved. Defendant excepted to the overruling of his objection to the admission of Malone's evidence."

No counsel appeared in this court for the prisoner.

JOHN W. A. SANFORD, Attorney-General for the State, cited 1 Greenl. Ev. § 229; *Aaron v. The State*, 37 Ala. 106; *Seaborn v. The State*, 20 Ala. 15; 7 Car. & P. 486.

JUDGE, J.—The books abound in adjudications upon the question, as to what degree of influence will exclude the evidence of confessions in criminal prosecutions; and upon this question there has been much contrariety of decision. "This is the more suprising, as the inquiry presents no peculiar difficulty. There is no intricate problem to be solved, no recondite principle to be explored or extracted." Joy on the Evidence of Accomplices, quoted in 1st Leading Cr. Cases, 182. It is not necessary, in this case, that we should enter into any general discussion of the subject, nor that we should notice with particularity the irreconcilable conflicts of authority upon the question. It seems now to be generally agreed, that many of the cases have gone too far in rejecting evidence of this character. Baron Parke, in *Regina v. Baldry*, (1 Leading Cr. Cases, 164,) said: "I confess that I can not look at the decisions without some shame, when I consider what objections have prevailed to prevent the reception of confessions in evidence; and I agree with the observation of Mr. Pitt Taylor, that the rule has been extended quite too far, and that justice and common sense have too frequently been sacrificed at the shrine of mercy."—1 Taylor on Ev. 369. Erle, J., in the same case, said: "I am much inclined to agree with Mr. Pitt Taylor; and according to my judgment, in many cases where confessions have been excluded, justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of *guilt*." And in speaking of the rule relating to the exclusion of such confessions, Mr. Phillipps, in his able treatise on the Law of Evidence, says: "The cases, probably, are rare in which such unfounded self-accusations

occur, or at least where a jury would be mislead by them ; and certainly the rule occasions, in a multitude of instances, the escape of the guilty.   *There is a general feeling, not un- founded, that the rule has been extended much too far,* and been applied in some cases where there could be no reasonable ground for supposing that the inducement offered to the prisoner was sufficient to overcome the strong and universal motive of self-preservation."—1 Phil. Ev. (4th Am. ed.) 543.   See, also, *Aaron v. The State,* 37 Ala. 106.

No controversy exists as to the proposition, that deliber- ate confessions of guilt are the most effectual proofs in the law.   But, to authorize such a confession to be introduced as evidence, it must be first shown to have been voluntarily made.—*Mose v. The State,* 36 Ala. 211.   This is usually shown by negative answers to direct questions, as to whether the confession had been procured by hopes held out, or fears excited.   But, although such is the usual course, still, direct questions, of such or similar import, are not indis- pensably necessary.   The confession is to be received or rejected by the court upon a preliminary inquiry into the circumstances under which it was obtained ; and if it ap- pears, by a recital of the attending facts and circumstances, that the confession was voluntary, it is admissible in evi- dence.

It is a legitimate conclusion from the facts appearing of record in the case before us, that the court made preliminary inquiry into the circumstances under which the prisoner's confession was obtained, and then overruled the objection to its admission.   Did the court err in admitting the evi- dence?

William B. Shelton, a policeman, testified that, while he had the prisoner under arrest, and was taking him on a boat down the river, he told the prisoner that Jordan had been arrested and shot.   Jordan, it appears, was deemed an accomplice of the prisoner, in the commission of the crime charged.   The witness admitted that what he had told the prisoner, about Jordan having been arrested and shot, was untrue, and that he had told him so to induce a confession. The witness stated, that the prisoner did not confess, nor make any statement in reply at the time ; but that he after-

wards, and on another occasion, voluntarily said to witness, "that the ferryman had promised him one dollar for taking over Mr. Norton, and that he went back to get it, but the old man (deceased) refused to pay it, and they had some words about it." The witness stated, that here the conversation was interrupted.

No objection was interposed to the introduction of this confession; and if there had been, it could not have been legally excluded; for it seems to be well settled, that a confession is admissible, although it is obtained by artifice or deception. In *Burley's case*, the prisoner was told untruly, and as an artifice, when in jail, that his accomplices were in custody. Upon hearing this, which was said to induce a confession, he confessed. The confession was admitted in evidence. This case is cited in Phillipps on Evidence, and mentioned by Roscoe, and by Starkie who says the conviction was afterwards approved by the judges.—1 Lead. Cr. Cases, note, p. 202.

Henry Malone, policeman, another witness, testified that he went to the jail, to bring the prisoner before the examining court; that after placing him in a buggy for that purpose, the prisoner asked witness if it was true that Jordan had been arrested, saying he had heard so. The prisoner remarked to the witness that he, the prisoner, "was in a bad scrape." The witness then said to the prisoner, "*If you know anything about the circumstances, tell the truth about it; it will be best to tell the truth about it.*"

We do not controvert the correctness of the rule, as laid down by the elementary writers, that a promise of benefit or favor, or threat or intimation of disfavor, connected with the subject of the charge, held out by a person having authority in the matter, will be sufficient to exclude a confession made in consequence of such inducement, either of hope or fear.—1 Phillipps on Evidence, (4th Am. ed.) 544; 1 Greenleaf on Evidence, § 222. The object of this rule, as stated by Mr. Phillipps, is, "to exclude all confessions which may have been procured from the prisoner by leading him to suppose that it will be better for him to admit himself to be guilty of an offense, which he really never committed."

The prisoner, in the case before us, could not have been led by the witness Malone to make any such supposition. It will be observed, that the prisoner commenced the conversation; and the witness only exhorted him, if he knew anything about the circumstances, to speak the truth —that it would be best to tell the truth about it. The admonition to say he was innocent, if such was the truth, was just as strong as to say he was guilty, if that was true; and he was warned that it *would be best* to say he was *innocent*, if such was the *truth*, as strongly as he was warned to say he was *guilty*, if that was the *truth;* no hopes being held out, or fears excited, to speak the one way or the other. Confessions, as already stated, which may have been procured by the prisoner's being led to suppose that it will be better for him to admit himself to be guilty of an offense which he really never committed, should be excluded; but it can hardly be said that telling a man to speak the truth is advising him to confess that of which he is not guilty.—*Enoch's case*, 5 Car. & Payne, 539. In the language of Erle, J., in *Regina v. Moore*, (2 Dennison, 522,) "As a universal rule, an exhortation to tell the truth ought not to exclude a confession."—See, also, *Fouts v. The State*, 8 Ohio, 98.

*Aaron v. The State*, 37 Ala. 106, was at least as strong a case for the prisoner as is the present. In that case, the substance of what the bailiff said to the prisoner was, that " truth was the best policy; that if he did the act, it was best to confess it; but if he did not do the act, then there was no wish he should say so." It was held by this court, that the prisoner's confession, in response to this exhortation, was properly received in evidence. In the opinion by STONE, J., the court say: "The prisoner, if innocent, was warned not to say he had done the deed, in language equally as strong as that which sought his confession if guilty. Truth was asked for; and we cannot conceive that any hope or fear was offered to the prisoner, to induce him to make a false confession of guilt."

Our conclusion in this case is, that the court below did not err in receiving evidence of the prisoner's confessions; and having carefully looked through the record, and finding

no error therein, the judgment of the city court must be affirmed, and the sentence of law carried into execution.

BYRD, J.—I am unable to concur with the majority of the court in the result attained in this most moment-ous issue to the prisoner. I admit that Baron Parke had just cause of shame when he looked into the decisions on the question involved in the determination of this case. But it seems to me the learned baron had more cause for shame in the many departures made from the wise and venerable principles of the common law on one side of this question, than on the other. Voluntary confessions were always admissible at common law, to whomsoever made. But to be so, they must appear to have been voluntary; and unless the court was clearly satisfied that they were so, they were excluded; and the court must decide the ques-tion, and cannot refer it to the jury.—*Bob v. State*, 32 Ala. 560. The law was more cautious to scrutinize the circum-stances under which confessions were made to officers who had the custody of the prisoner; and justly so. When the law, by its officers, takes the custody of a human being for purposes of justice, it should, at the same time, throw a shield of protection around him, to guard him against the natural solicitations and importunities of the ministers of justice. Cut off, as the prisoner is, from any association with his friends, except in the presence of the officer,—with his mind burdened and oppressed with impending calamity, and a serious charge made against him, involving life and death, and anxious to reply to the interrogation of the offi-cer having him in charge, he may make, and often has made. confessions, the very absurdity and falsehood of which may involve him in greater danger, and sometimes in a conviction of the crime with which he is charged. If he answers that he is not guilty, it is not evidence for him. His only chance to get his confessions in as evidence, is to admit something against himself. If he is innocent, and so answers, there is an end of the matter, unless, in the agony of his mind, he makes some statement which turns out to be untrue, when that is seized hold of to convict him.

Mr. Greenleaf, in his erudite and accurate treatise on the

Law of Evidence, puts this subject in a true and striking light, in a few sentences. He says, " For, besides the danger of mistake from misapprehension of witnesses, the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue confession. *The zeal*, too, which so generally prevails, to detect offenders, especially in cases of aggravated guilt, and the strong disposition, in the persons engaged in the pursuit of evidence, to rely on *slight* grounds of suspicion, which are *exaggerated* into sufficient proof, together with the character of the persons necessarily called as witnesses, in cases of *secret* and *atrocious* crime, all tend to impair the value of this kind of evidence, and sometimes *lead to its rejection,* where, in civil actions, it would have been received."—Vol. 1, § 214.

At section 219, he says,  " Before any confession can be received in evidence, it *must* be shown that it was *voluntary.*"   In section 220, he gives examples.   In section 222, he says:   " In regard *to the person by whom the inducements were offered,* it is very clear that, if they were offered by the prosecutor, or by his wife, the prisoner being his servant, or by an *officer* having the prisoner in custody, or by a magistrate, or, indeed, by *any one having authority* over him, or over the prosecution itself, or by a private person in the presence of one having authority, the confession will not be deemed voluntary, and *will be rejected.*   The *authority* known to be possessed by those persons, may well be supposed both to animate the prisoner's hopes of favor on the one hand, and on the other to inspire him with awe, and in some degree to overcome the powers of his mind."

Mr. Phillipps, in his learned work on Evidence, puts the matter in an equally clear light.  He says:  "But the confession must be voluntary, not obtained by improper influence, nor drawn from the prisoner by means of a threat or promise ; for, however *slight the promise* or threat may have been, a confession so obtained cannot be received in evidence, on account of the *uncertainty* and *doubt* whether it

was made, rather from a motive of fear or *of interest*, than from a sense of guilt."

Now, who can say that the confession excepted to in this case, made to an officer, was not made from a *motive of interest*, founded on the declaration of the witness Malone, " that it will be best to tell the truth about it." The very *uncertainty* about it, is, in Mr. Phillipps' opinion, sufficient to exclude the confession. Take the doctrine of Mr. Greenleaf and Mr. Phillipps, as above quoted, and to me it is evident that the confession should have been excluded.

But, even if I were *uncertain* on this question, or had a reasonable doubt, in a case of life and death I would give the prisoner the benefit of that uncertainty and doubt. My construction of the expression used by the witness, and as the prisoner had the right to understand it, is, that he was requested to speak about the "circumstances", which, in my opinion, assumed his guilt, and that it would be best for him to speak the truth about it, if he were guilty. If innocent, and he said so, it would neither have been evidence which the prisoner could have used in his defense, nor released him from custody. Every man is presumed to know the law—a prisoner as well as an officer.

The prisoner may be guilty, but the law requires legal proof, and the verdict of a jury, before he is presumed guilty. There is one singular circumstance in this case. The prisoner asked the witness Malone, " if it was true that Jordan had been arrested", saying he had heard so. Now it does not appear that this question was ever answered. It seems that another officer had told the prisoner that Jordan had been arrested and "*shot.*" It seems that King had an idea that it was false. But Malone, if he answered the question, or did not, has not stated ; and it shows what is often true, that one is oblivious of circumstances, which, if remembered, might change the whole character of the confession. If Jordan had been shot, as the prisoner had been informed, he could not have understood Malone as seeking to get him to *turn State's witness against Jordan*, when he was told "it was best for him to tell the truth about it."

I do not think that the case of *Aaron v. The State* is the

law; and in a case of life and death, I shall follow what I conceive to be the principles of common law, in preference to the decisions of courts, especially when they are so conflicting.

This conflict and confusion in the adjudications has occurred, in my opinion, by a departure from principle. A slight departure in one case, was the foundation for it in another; and so on, until they are in hopeless and inextricable irreconcilability. A return to acknowledged first principles is the only path to justice, and a strict adherence to them is, in my judgment, the best and safest course to be pursued in all cases of difficulty.