## THE PEOPLE v. ALMÉSTICO.

### APPEAL from the District Court of Ponce.

No. 350.—Decided May 2, 1912.

CRIMINAL LAW—CONFESSION OF ACCUSED—EVIDENCE.—The testimony of witnesses concerning a confession voluntarily and freely made to them by the accused is not hearsay but direct evidence.

ID.—CONFESSION OF ACCUSED—PROOF THAT IT WAS MADE VOLUNTARILY AND FREELY.—The testimony of witnesses relating to a confession made by the accused does not lose its value on account of the fact that the *fiscal* did not offer evidence to show that the confession was made freely and voluntarily, because when the accused does not object to the testimony concerning the confession it is presumed that the confession was made freely and voluntarily unless the contrary appears from the testimony itself.

ID.—CONFESSION OF ACCUSED OBTAINED BY DECEIT—POLICE—DETECTIVE.—The fact that a policeman, a detective, or any other person obtained a confession by deceit is not of itself sufficient to render the testimony inadmissible.

ID.—CLASSES OF MURDER IN FIRST DEGREE.—According to our code there are three classes of murder in the first degree, namely, that which is perpetrated by means of lying in wait, poison, or torture; that which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem; that which is committed by any other kind of wilful, deliberate, and premeditated killing.

ID.—MURDER IN FIRST DEGREE—LYING IN WAIT—DELIBERATION AND PREMEDITATION.—When murder in the first degree is perpetrated by lying in wait and this fact is proven it is not necessary to show any other acts of deliberation or premeditation in order that the crime may be classified as murder in the first degree.

ID.—INSTRUCTIONS TO JURY—CRIME OF LESS DEGREE.—In a case of murder in the first degree the court did not commit an error in failing to instruct the jury concerning the crime of homicide when there was nothing in the evidence tending to show that the crime could be reduced to that grade.

ID.—LIST OF WITNESSES FOR PROSECUTION—INFORMATION.—There is no provision in our criminal laws requiring the *fiscal* to endorse on the information the names of all the witnesses for the prosecution whom he may intend to examine. It is sufficient that he name those whom he examined for the purpose of filing the information.

ID.—VERACITY OF WITNESSES—PRESUMPTIONS—IMPEACHMENT OF WITNESS.—The law does not require that the presumption of the veracity of a witness be attacked by proofs of specific reproachable acts but only that it be proven that his general reputation for veracity, honesty, and integrity is bad or that he has been convicted of an infamous crime.

ID.—IMPEACHMENT OF WITNESS—SPECIFIC REPREHENSIBLE ACTS.—Evidence tending to prove specific reprehensible acts and a certain quarrel between two persons to whom, according to the witness, the accused attributed some participation in the crime, is not admissible for the impeachment of a witness.

The facts are stated in the opinion.

*Mr. Luis Muñoz Morales* for appellant.

*Mr. Charles E. Foote, fiscal,* for respondent.

MR. JUSTICE ALDREY delivered the opinion of the court.

The *fiscal* of the District Court for the Judicial District of Ponce filed an information against Juan Alméstico charging that during the night of March 28-29, 1910, in *barrio* Machuelo of Ponce, within the judicial district of Ponce, the said accused, Juan Alméstico, did deliberately, treacherously and with malice aforethought, showing that he had a perverted and malignant heart, unlawfully wound Pablo Franchi with a blunt instrument upon the back of the head and inflicted upon him four wounds in the back with a sharp instrument, causing his instant death.

.The defendant pleaded not guilty, and a day having been set for the trial the same was held before a jury which, after hearing the evidence, the arguments of counsel and the instructions of the judge, returned a verdict finding Juan Alméstico guilty of the crime of murder in the first degree.

Before the court rendered judgment the accused moved for a new trial on the ground that the court had erred: (1)

In permitting certain witnesses introduced by the *fiscal* to testify without notifying the defendant that they would be used against him; (2) because it refused to allow counsel for accused to ask the witness, Cornelio Ayala, whether he had ever been prosecuted for having disguised himself as a machinist while serving as a detective and incited other persons to gamble in order to raid their games, the purpose of the said questions being to impeach the integrity and veracity of that witness; (3) because it did not permit several witnesses introduced by the accused to testify to prove the same fact which it was sought to show on cross-examination with respect to Cornelio Ayala; and (4) because the court refused to allow other witnesses for the accused to be examined in order to show that, prior to the commission of the crime, enmity and bad blood existed between Julio Colón and Carlos Torres, which would show that the statement which the witness, Cornelio Ayala, testified was made by the accused to the effect that he and Julio Colón had killed Franchi by order of Carlos Torres could not be true; this evidence also tending to impeach the veracity of the witness, Ayala.

The motion for a new trial was overruled by the court and the accused did not take an appeal from that order, but only from the judgment; but as the grounds of the motion for a new trial are the same as the exceptions taken and included in the bill of exceptions herein, and as the said exceptions served as a basis for the appeal from the judgment, the questions raised by the motion for a new trial will be disposed of in the decision of the questions involved in the appeal from the judgment.

In addition to the exceptions above mentioned, the appellant alleged as errors that the instructions of the judge to the jury were insufficient, and that the evidence was not sufficient to support a verdict of guilty.

With respect to the information, the appellant did not allege that it was defective, but notwithstanding this fact we have carefully examined it and find it sufficient.

The allegation of appellant that the evidence is insufficient to support a verdict of guilty makes it necessary for us to summarize the evidence in order to ascertain whether or not the allegation is well founded.

From the statement of the case which we have before us for a decision of the appeal, it appears that the witness, María Josefa Anciani, who lives in *barrio* Machuelo Arriba, testified that she knew Pablo Franchi; that the last time she saw him was on March 28, at 7 o'clock in the evening, at which time he set out on a bicycle in the direction of the "cine," and that he carried no weapon other than a knife, with a white handle ornamented with a sprig of scarlet flowers with a very sharp point, forming the shape of a crescent; that between 1 and 2 o'clock in the morning of March 28-29 she saw him again dead on the carretera leading from Ponce to Juana Díaz, before reaching her house; that he was searched by the judge and the policeman, and the knife with which he left the house was not found, and that she had not seen it again.

According to the testimony of Dr. López Nussa, Pablo Franchi had received a blow upon the head and sustained several wounds in the back and, besides, another blow on the forehead; that the post-mortem examination showed that the wound on the left side of the head was about eight centimeters long, deep, and that it produced a fracture at the base of the skull; that it extended from the region of the temple toward the eye socket; and that he had sustained another small wound about one and a half centimeters long and one centimeter deep; that the wound on the skull must have been produced by a blunt instrument, like a stick, similar to that introduced in evidence at the trial; that it could hardly have been produced by a rock, since it would necessarily have been very large and would have produced a depression in the skull and the wound would not have been a straight one.   In regard to the three wounds in the back, they were about three centimeters long, very narrow, very clean-cut and produced by a sharp-cutting instrument such as a knife.

At the trial the *fiscal* introduced in evidence, without objection from the accused, a stick which belonged to the latter, one of the ends of which was stained and which stains, according to the testimony of Dr. Ferrán, were positively blood and not very old.  This expert also testified that two small stains upon the trousers of Alméstico had been examined and proved to be blood stains.

According to the testimony of Judge López Acosta, on the night of March 28-29 he went to the place where the body of Pablo Franchi was found on the carretera; that the corpse was searched and no knife was found; that after daybreak, at about 5 o'clock in the morning, an examination was made of the surrounding ground and tracks were found by the side of the road, and in looking around he found a knife, which is the one introduced in evidence at the trial, and that from the time he saw the body until the knife was found there had not been more than five or six persons at the place, and that in the investigation in which the knife was found he was accompanied by Sergeant Torres Quintero and another policeman.

Sergeant Torres Quintero, of the police force, confirmed the statement in regard to the finding of the knife as testified by the judge.

Deogracias Aguirre, an insular policeman, also went to the place where the crime was committed, and he having been given a list from which to make an investigation, the name of Juan Alméstico appearing on the said list he went to his house to arrest him, but did not find him there, and that returning to the place at which the crime was committed he saw him standing in a patch of cane near by and there arrested him and that accused became very nervous; that Alméstico commenced to walk up and down the carretera and picked up a match stem with which he commenced to pick his gums until he made them bleed and let a drop of blood fall on his clothes, when he called the witness and said: "Aguirre, come here and notice that this drop of blood is from my mouth;" that this was so, and he then called Alméstico's attention to

the back of his trousers, where he had another blood stain, which was not from his mouth and about which the accused offered no explanation.

Insular policeman, José R. Monsón, testified in substance the same as the previous witness, but added that when the accused showed Aguirre the blood stain, he said: "Look, Aguirre, they cannot say that this is the blood of the dead man."

Juan Alicea, an old man, 60 years of age, got up that night between 12 and half past 12 to go to his work on the *hacienda,* and then saw Pablo Franchi pass by on his bicycle, and a little later he saw a man on foot, who turned out to be the *comisario,* and the witness accompanied him to his house and thereafter went his way alone, and he heard some grunts (groans) and a few minutes later heard a man running toward him, but that he stopped running at a distance of about 8 or 10 steps from him, and that the man who was running was Juan Alméstico whom he knew perfectly well; that he was dressed in a black undershirt and carried a stick; that the witness became afraid because they said the man was very daring and for that reason he turned back; but, later, having met Monserrate García and Emiliano Rodríguez he again set out with them up the road which he had left; that he told them that he was going to listen for some grunts (groans) which he had heard along the road, and when they reached a place near some *hucar* trees Monserrate García stumbled over the dead body of Pablo Franchi and said: "It is Mr. Pablo Franchi, who passed along ahead of us a few minutes ago;" that since that night he has not talked with Emiliano Rodríguez or with Monserrate García, and that when on that night he met them he did not tell them he had heard a man running on horseback and another one on foot, nor did he tell them that he had met Alméstico.

In his testimony Monserrate García confirmed the fact that he and Emiliano Rodríguez met Juan Alicea on the *carretera* and continuing their way together, the three found

the dead body of Franchi. He stated that Alicea had told him that he had heard some grunts (groans) and had seen some one on horseback.

This witness, who was later introduced by the accused, testified that he was a peon working for Carlos Torres, and that on that night Alicea had told him that he had seen the indistinct image of a person with shoes on riding on horseback, and that on another occasion after that night Alicea asked them if they had not met three persons that night, and when the witness replied that he had met no one, Alicea said: "*Caramba!* what could have been the matter with me that night?"

Maximino Rodón testified before the jury that Pablo Franchi kept a store, to which the witness went very often; that on the Saturday before the Monday on which Franchi died he saw the accused in front of Franchi's store; that Franchi told him to wait and they would go out together, and while witness was waiting for Franchi down on the ground Alméstico came up with a stick in his hand similar to the one which was shown him at the trial, and stopped in front of the store, and witness believes that he did not see him because he was urinating and was partly hidden; that having asked him if anything was the matter Alméstico answered no and turned back; that when he told Franchi that Alméstico had been there Franchi replied that he had a good many enemies.

Eudosia León, one of the concubines of the accused, identified the stick and a black undershirt which were seized in her house as the property of the accused.

Inés Piñero stated that she knew as the property of Pablo Franchi a knife with a white handle, ornamented with a sprig of scarlet flowers, which she saw at the house of Eudosia León, a concubine of the accused, two or three days after the death of Franchi, and called Eudosia's attention to the fact that the knife belonged to Pablo Franchi. The knife with a white handle referred to had a sharper point than the other knife which was exhibited to her at the trial; and in regard

to the latter, she testified that she knew it because it had been
hers until she sold it to the accused, Alméstico, about a month
before the death of Franchi, and a few days before his death
she saw the accused sharpening a pencil with it.

The witness, José Franco, did not testify to anything of
importance.

In addition to other witnesses, the *fiscal* introduced Cor-
nelio Ayala, who said he was a detective in the insular police
force, and the *fiscal* having told him on the 30th of March that
he needed him in the investigation of a crime, the *fiscal* sent
for the warden of the jail, who on that date took him into the
jail as a prisoner disguised as a machinist, dressed in a soiled
suit and cap, and placed him in the same cell with Juan Al-
méstico; that he entered the cell complaining bitterly about
the police and saying that they had beaten him; that as soon
as the warden left the accused asked him where he was from,
to which he replied that he had been at Aguirre, working as a
machinist, and that he made the accused believe that about
three years before he had had some difficulty with Pablo
Franchi and had struck him several times on account of some
money that he had tried to collect and that he did not owe;
and that as Franchi had been wounded they had taken him
prisoner on suspicion that he was implicated in the crime;
that he spoke very badly about the police, and they were thus
very friendly all night, and the following day they related to
each other episodes of their lives; that at that time the ac-
cused did not tell him anything about the crime; that the
next night the warden of the jail called for him and took him
to the office of the *fiscal,* and that upon returning therefrom
again to the cell he told the accused that he had been before
the *fiscal,* who had come over to him and then told him to
leave the room, and that Lespier, the warden of the jail, and
the *fiscal* remained inside, and that then he heard the *fiscal*
tell the warden that the doctor had certified that the blood
on Alméstico's trousers was the blood of a human being and
not that of a hog; that when he told him this they were both

seated, and Alméstico suddenly jumped up and said: "My friend, you don't know how much I thank you for this," and the witness then asked him the question: "Are you Juan Alméstico?" to which he replied that he was; and when the witness told him that it looked bad, Alméstico said: "Oh, my friend! how shall I get out of this?" Then the accused asked him to help him secure a lawyer, and when witness asked him whether he thought he could save himself in that way, Alméstico answered: "Yes, because I will tell him the truth; I will tell him how the crime was committed, and he can save me because I will offer him money to give to the doctor, so that he will testify that the blood is the blood of a hog, and so Don Carlito can be saved because Don Carlito was the one who ordered me." Then the witness asked him how it had happened, whether he alone had killed him, and he answered no; that it was between himself and one Julio Colón, who was also a prisoner and who had struck him the first blow, and that when he fell to the ground he (Alméstico) stabbed him three or four times; that when witness asked him why he had kept on the trousers which would give him away, he answered that he had not taken them off because he did not think they had anything on them; that the shirt was black and did not have any stain on it, and that the knife had been hidden in the house of his concubine, as also the shirt and stick. Alméstico also told him in reply to a question that an old man had seen him but that he did not think that he could prove anything; that he learned from the accused that he had two concubines; that he had been with two other individuals watching for Franchi ever since Saturday night; that he could have killed him before because on Saturday night he had been with two other persons watching for him, but that he could not kill him because he was with another person in a carriage, and that he had been waiting for him in ambush for three nights.

After these statements made by the accused to the witness, the *fiscal* and the police, together with the witness, went to

the house of Eudosia León, Alméstico's concubine, and there seized a stick and a black undershirt.

Adolfo Lespier, the warden of the Ponce jail at that time, confirmed the statement that he had placed Cornelio Ayala in the same cell with Juan Alméstico.

This was all of the evidence introduced in this case by The People. The evidence for the defense consisted in the testimony of Monserrate García, which we have already set forth, and that of Eudosia León, who testified that she was one of the accused's two concubines; that Franchi was killed 15 days after she gave birth to a child, and that on that night Alméstico came to her house at about 11 o'clock. She denied that Inés Piñero was at her house after the death of Franchi and that in her presence she had taken out a box from her trunk containing a knife. Afterwards she stated that she did not remember whether Inés Piñero had been at her house before or after the death of Franchi.

Finally, the witness, Antonio Ferrari, replied to questions propounded by the *fiscal* that when Eudosia León was confronted with Inés Piñero the former admitted that the latter had been at her house two days after the death of Franchi, but denied that she had seen any knife whatsoever.

A simple reading of the testimony introduced in this case before the jury is enough to convince one that there is sufficient evidence of the guilt of the accused, as also that two classes of evidence were offered: One class was circumstancial and the other direct evidence, to which class the confession made by the accused to the witness, Cornelio Ayala, belongs.

In regard to the latter, it is well to remember what this court said in deciding the case of *The People* v. *Rivera, alias "Panchito,"* reported in volume 7 P. R. R., 336, and from which we quote the following:

"The testimony of witnesses who detailed to the court the confessions made by the defendant to them cannot be considered as hearsay, but was direct evidence of the acts of the defendant, which can be counted against him on the trial. Should the defendant wish to ex-

clude confessions which are proposed to be introduced against him, he should bring them within one of the exceptions laid down by the law as expounded by the elementary writers. That is to say, he should show that he was under duress or that he was acting under the influence of hopes or promises held out to him in the event of making a confession.''

See also the following cases in support of this doctrine, and in which, as in the case from which the foregoing quotation is taken, numerous authorities are cited in support thereof: *The People* v. *Eligier*, 9 P. R. R., 357; *The People* v. *Dones*, 9 P. R. R., 423; *The People* v. *Kent*, 10 P. R. R., 325; *The People* v. *Román*, 10 P. R. R., 532; *The People* v. *Hernández*, 14 P. R. R., 217; *The People* v. *Morales*, 14 P. R. R., 227.

So, in accordance with the doctrine established by the jurisprudence, we must regard the confession made by the accused to Cornelio Ayala as direct evidence, provided it was made freely and voluntarily.

In this case the representative of The People of Porto Rico offered no evidence whatever to show that the confession was made freely and voluntarily by Juan Alméstico—that is to say, that it was not made by reason of threats or fear or induced by any other improper motive—but notwithstanding the fact that the *fiscal* did not introduce such evidence, the accused made no objection to the testimony of Cornelio Ayala relating the statements attributed to the accused, nor has the accused offered any evidence whatsoever tending to show that such statements were not voluntarily made. Notwithstanding this, these facts do not render the testimony of Cornelio Ayala any the less important, because even in the United States where such evidence is required, if it is not introduced and the confession is admitted without objection on the part of the accused, it is presumed that it was voluntary unless the contrary appears from the testimony of the witness himself. *State* v. *Madison*, 47 La., Ann., 30; *State* v. *Davis*, 34 La. Ann., 351; *People* v. *Barker*, 60 Mich., 277.

Aside from the testimony of Cornelio Ayala, it is seen that the confession of the accused was voluntary, because it was made spontaneously when Ayala told the accused that he had heard the *fiscal* say that the stains on his trousers were of human blood, and no threats were made nor inducements held out, which, of course, it is not to be presumed Ayala would do, nor could Alméstico so believe, in view of the fact that he was conversing with a person whom he supposed to be a machinist in jail accused of a crime.

It is true that Cornelio Ayala obtained the confession of the accused by deceit in telling him that the stains on a pair of trousers taken from Juan Alméstico were caused by human blood, but this deceit was not such as to deprive the accused of his free will to make or not to make the confession of his crime. The fact that a policeman, a detective, or any other person obtains a confession through deceit is not in itself sufficient to render such evidence inadmissible. *Borton* v. *State,* 107 Ala., 108; 18 So., 284; *Stone* v. *State,* 105 Ala., 60; 17 So., 114; *King* v. *State,* 40 Ala., 314; *Wigmore on Evidence,* sec. 841.

The confession which is direct evidence has, however, been corroborated in this case, so it is seen that the confession made by Alméstico that he had been lying in wait for two or three nights, before the commission of the crime, in ambush for Pablo Franchi is corroborated by the testimony of the witness, Rodón; the fact that he was seen by an old man a few moments after the crime was shown by the testimony of Juan Alicea; that he had two concubines was shown by Eudosia León; that on the night the crime was committed he wore a black undershirt is also shown by the testimony of Juan Alicea; the statement that this undershirt and the stick which he carried on that night were found in the house of Eudosia León was proved by her testimony, as also by the fact that they were found in her house.

But independently of this direct evidence which is corroborated in this case, there was other circumstantial evi-

dence, such as the fact that when Franchi learned that one Saturday Juan Oswaldo Alméstico had been to his store he only answered that he had some enemies; that the accused was seen at the time the crime was committed; that he was running along the carretera at a place very near where the crime was perpetrated; that a knife belonging to the accused was found near the body; that another knife which Pablo Franchi carried on that night was not found upon him when he was dead, but was later seen in the house of one of the accused's concubines two or three days after the commission of the crime; that a stick belonging to the accused was stained with blood, and that the same was the case with the trousers which the accused wore when he was arrested, two blood stains having been found thereon.

These circumstances are useful because they tend to show the guilt of the accused to the exclusion of any other person, and his confession, which was presented in evidence together with the other fact, is sufficient to justfy the conclusion that the accused took the life of Pablo Franchi in the illegal and violent manner charged in the information, and to support the verdict of the jury since the essential elements of the crime of murder in the first degree are shown by these facts.

Our Penal Code provides that murder is the unlawful killing of a human being with malice aforethought; that all murder which is perpetrated by means of poison, lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree.

There are, then, three classes of murder in the first degree: That which is perpetrated by lying in wait, by means of poison, or by torture; murder perpetrated in committing or attempting to commit the crime of arson, rape, robbery or mayhem; and murder perpetrated in any other wilful, deliberate and premeditated manner.

This case falls within the first classification because, ac-

cording to the confession of the accused himself, he was lying in wait for two or three nights, and this having been shown to be the case and having caused the death under these circumstances, it was not necessary to present other evidence tending to show deliberation and premeditation in order that the crime might be classified as murder in the first degree.

The appellant maintains that the trial court did not instruct the jury in regard to the crime of manslaughter, and that this failure constitutes an error on the part of the court.

It is true that no such instruction was given to the jury, but the court did not commit any error because there was nothing in the evidence to show the commission of the crime of manslaughter, and under such circumstances the judge should not instruct the jury as to the lesser degree of the crime charged, when there is nothing in the evidence to show that the crime was reduced to that degree. *Blashfield Instructions to Juries,* vol. 1, pp. 86 and 190; *Wharton on Homicide,* pp. 158–160.

In the case of *Sparf* and *Hansen v. United States,* 156 U. S., 51, the Supreme Court of the United States said:

"The requests for instruction made by the defendants were based upon section 1035 of the Revised Statutes of the United States, providing that 'in all criminal causes the defendant may be found guilty of any offense the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offense so charged: *Provided,* That such attempt be itself a separate offense.'

"The refusal to grant the defendants' requests for instructions, taken in connection with so much of the charge as referred to the crime of manslaughter, and the observations of the court when the jury through their foreman applied for further instructions, present the question whether the court transcended its authority when saying, as in effect it did, that in view of the evidence the only verdict the jury could under the law properly render would be either one of guilty of the offense charged or one of not guilty of the offense charged; that if a felonious homicide had been committed by either of the defendants, *of which the jury were the judges from the proof,* there was nothing in this case to reduce it below the grade of mur-

der; and that, 'as one of the tribunals of the country, a jury is expected to be governed by law, *and the law it should receive from the court.'*

"The court below assumed, and correctly, that section 1035 of the Revised Statutes did not authorize a jury in a criminal case to find the defendant guilty of a less offense than the one charged, unless the evidence justified them in so doing. Congress did not intend to invest juries in criminal cases with power arbitrarily to disregard the evidence and the principles of law applicable to the case on trial. The only object of that section was to enable the jury, in case the defendant was not shown to be guilty of the particular crime charged, *and if the evidence permitted them to do so,* to find him guilty of a lesser offense necessarily included in the one charged, or of the offense of attempting to commit the one charged. Upon a careful scrutiny of the evidence, we cannot find any ground whatever upon which the jury could properly have reached the conclusion that the defendant, Hansen, was only guilty of an offense included in the one charged, or of a mere attempt to commit the offense charged. A verdict of guilty of an offense less than the one charged would have been in flagrant disregard of all the proof, and in violation by the jury of their obligation to render a true verdict. There was an entire absence of evidence upon which to rest a verdict of guilty of manslaughter or of simple assault. A verdict of that kind would have been the exercise by the jury of the power to commute the punishment for an offense actually committed, and thus impose a punishment different from that prescribed by law."

Applying this doctrine to the present case, we may say that there is no evidence here which could justify a verdict of manslaughter, wherefore the judge was not bound to instruct the jury upon that crime, and it did not commit the error alleged.

The assignments of error still to be considered are the grounds alleged in support of the motion for a new trial, the first being that the court should not have permitted certain witnesses introduced by the *fiscal* to be examined over the objection of the accused, because they did not appear in the list on the back of the information.

In regard to this point, to show that the error alleged was not committed, it will be sufficient to quote from our de-

cision of a similar question in the case of *The People* v. *Román,* decided on the 8th of this month:

"With respect to the question of indorsing the names of the witnesses, there is no requirement of law making it mandatory on the *fiscal* to indorse all the witnesses of whom he has knowledge. It is sufficient if he indorses the names of those that he examined for the purpose of filing the information. In some states indorsement is a positive requirement of law; but this is not the case in California, from which we derive our jurisprudence. *People* v. *Symonds,* 22 Cal., 349; *People* v. *Jocelyn,* 29 Cal., 564; *People* v. *Kent,* 10 P. R. R., 325. While there was no technical error, yet if it should appear that the defendant was, in fact, surprised by the introduction of witnesses whose names were not indorsed on the information, this failure to indorse ought always to have great weight in determining whether the court did or did not abuse its discretion in refusing to continue the case and to permit the defendant to obtain contradictory or impeaching testimony."

The other three assignments of error based on the three remaining grounds of the demurrer filed by the accused, as appears from the bill of exceptions which was approved by the judge, have been treated together by the appellant, and we may do the same because they are based upon the same ground.

The district court did not permit the witness, Cornelio Ayala, to answer certain questions propounded by the accused on cross-examination, whereby it was sought to show that two or three years before the said witness, being a detective in Ponce and disguised as a machinist, invited different persons to gamble, and after inducing them to do so and winning their money, complained against them or sent word to other police officers to come and raid the game, the witness having been twice prosecuted for so doing.

The accused attempted to prove this same fact by the testimony of different witnesses, and the court likewise refused to admit that class of evidence.

He likewise introduced witnesses to show that some time prior to the death of Franchi, Julio Colón was an enemy of

Carlos Torres because of the refusal of the latter to acknowledge an illegitimate child which, according to Julio Colón, his sister-in-law had by Torres. This evidence was excluded by the court and the accused took an exception, as in the case of the other instance of exclusion of evidence by the court.

By these three means the accused attempted to impeach the testimony of Cornelio Ayala.

The presumption established by the law that every witness speaks the truth is *juris tantum* and, therefore, may be overcome by the manner in which the witness testifies, by the character of his testimony, or by evidence affecting his veracity, honesty, or integrity, or by contradictory evidence; the party against whom a witness is presented may impeach such witness by contradictory evidence or by evidence tending to show that his reputation as to veracity, honesty, or integrity is generally bad, but not by evidence of reprehensible acts, except the fact that he has been convicted of a felony which can be shown by the examination of the witness, or by the entry of the judgment. A witness may also be impeached by evidence showing that on other occasions he has made statements at variance with those made by him at the trial.

Such are the rules laid down in the Law of Evidence by which a witness may be impeached or disqualified, and, according to these rules, the court did not err in excluding that class of evidence.

The law does not allow the presumption of the veracity of a witness to be attacked by evidence of particular acts more or less reprehensible, but it requires evidence tending to show that the reputation of a witness is generally bad as to his veracity, honesty, or integrity, or by evidence of his conviction of a felony. *People v. O'Brien*, 96 Cal., 171; *Evans v. DeLay*, 81 Cal., 103; *Jones v. Duchow*, 87 Cal., 109; *Barkly v. Copeland*, 86 Cal., 483; *Sharon v. Sharon*, 79 Cal., 633.

The accused did not attempt to prove that the general reputation of the witness, Ayala, was bad, but he attempted

to show particular acts which he deemed reprehensible and also a certain quarrel between two persons whom the accused, through the witness, charged with participation in the crime, but such evidence not tending to show the general bad reputation of the witness was inadmissible to impeach the veracity of the witness, Ayala, and, therefore, the court did not err in excluding it.

We have considered and disposed of all of the grounds of the appeal, and having also carefully considered the transcript of the record and the bill of exceptions and the statement of facts, we do not find that any fundamental error has been committed, and, therefore, the judgment must be affirmed.

*Affirmed.*

Chief Justice Hernández and Justices MacLeary, Wolf and del Toro concurred.