## El Pueblo *v.* Alméstico.

Apelación procedente de la Corte de Distrito de Ponce.

No. 350.—Resuelto en mayo 2, 1912.

Derecho Penal—Confesión del Acusado—Pruebas.—Las declaraciones de testigos acerca de la confesión hecha por el acusado a ellos voluntaria y libremente, constituye evidencia directa y nó prueba de referencia.

Id.—Confesión del Acusado—Prueba de que fué Hecha Libre y Voluntariamente.—El testimonio de testigos que relatan la confesión hecha por el acusado, no pierde su valor por el hecho de que el Fiscal no haya presentado prueba para demostrar que la confesión fué hecha libre y voluntariamente, pues cuando el acusado no se opone a la presentación de la prueba de confesión, se supone que fué hecha libre y voluntariamente, a menos que lo contrario aparezca de la propia declaración del testigo.

ID.—CONFESIÓN DE UN ACUSADO OBTENIDA MEDIANTE ENGAÑO—POLICÍA—DETEC-
TIVE.—El hecho de que un policía, detective o cualquiera otra persona obtenga
una confesión mediante engaño, no es por sí solo bastante para hacer inadmi-
sible esa evidencia.

ID.—CLASES DE ASESINATO EN PRIMER GRADO.—Según nuestro Código Penal existen
tres clases de asesinato en primer grado: el que se perpetra por medio de
acecho, veneno o tortura; el que ocurre al cometer o intentar cometer delito
de incendio, violación, robo o mutilación; y el perpetrado en cualquier otra.
forma voluntaria, deliberada y premeditada.

ID.—ASESINATO EN PRIMER GRADO—ACECHO—DELIBERACIÓN Y PREMEDITACIÓN.—
En el asesinato en primer grado perpetrado por medio de acecho, demostrado
ese extremo, no es necesario presentar otras pruebas de deliberación y preme-
ditación para que el delito se califique de asesinato en primer grado.

ID—INSTRUCCIONES AL JURADO—DELITO DE GRADO INFERIOR.—No comete error
el tribunal que en un caso de asesinato en primer grado no instruye al jurado
respecto del delito de homicidio, cuando no hay nada en la evidencia que
pudiera justificar el que el delito se rebajara a ese grado.

ID.—LISTA DE TESTIGOS DE CARGO—ACUSACIÓN.—No hay precepto legal alguno en
nuestras leyes penales que exijan al Fiscal que haga constar al dorso de una
acusación, todos los testigos de cargo que ha de utilizar. Es bastante con
que mencione aquellos que él ha examinado con el fin de presentar la acu-
sación.

ID.—VERACIDAD DE LOS TESTIGOS—PRESUNCIONES—IMPUGNACIÓN DE LA VERACIDAD
DE UN TESTIGO.—La ley no quiere que la presunción de veracidad de un tes-
tigo se ataque con prueba de determinados actos más o menos reprochables,
sino que exige la prueba de que su reputación es generalmente mala en cuanto
a veracidad, honradez e integridad, o por prueba de convicción de algún delito
grave.

ID.—IMPUGNACIÓN DE LA VERACIDAD DE UN TESTIGO—ACTOS DETERMINADOS RE-
PROCHABLES.—No es admisible como prueba para impugnar la veracidad de
un testigo, la evidencia tendente a demostrar actos determinados reprochables
y cierto disgusto habido entre dos personas a quienes el acusado por boca del
testigo atribuye alguna participación en el crimen.

Los hechos están expresados en la opinión.

Abogado del apelante: *Luis Muñoz Morales.*

Abogado del apelado: *Sr. Charles E. Foote, Fiscal.*

EL JUEZ ASOCIADO SR. ALDREY, emitió la opinión del tri-
bunal.

El Fiscal de la Corte de Distrito del Distrito Judicial de
Ponce presentó en ella una acusación contra Juan Aléstico,
imputándole que durante la noche del 28 al 29 de marzo de
1910 y en el barrio ''Machuelo'' de Ponce, que forma parte del
Distrito Judicial de Ponce, dicho acusado Juan Aléstico con
malicia premeditada, alevosa y deliberadamente y demostran-
do tener un corazón pervertido y maligno infirió ilegalmente a

Pablo Franchi una herida con instrumento contundente en la parte posterior de la cabeza y cuatro heridas en la espalda con un instrumento cortante, como consecuencia de las cuales falleció inmediatamente.

El acusado alegó ante la corte no ser culpable de ese delito, y señalado día para el juicio, este tuvo lugar ante un jurado el que después de oir la evidencia, las argumentaciones de los abogados y las instrucciones que le dió el juez de la corte, pronunció su veredicto declarando a Juan Aléstico culpable del delito de asesinato en primer grado.

Antes de dictarse sentencia por la corte, el acusado solicitó de ésta que le concediera un nuevo juicio, fundándose para ello en que la corte había cometido error: 1°. permitiendo que declarasen ciertos testigos presentados en el juicio por el Fiscal sin haber sido notificado el acusado de que iban a ser usados en su contra; 2°. porque no consintió que la representación del acusado preguntara al testigo Cornelio Ayala si había estado procesado anteriormente porque, como detective y finjiéndose maquinista, incitaba a otras personas a jugar para luego sorprenderlas, preguntas que tenían por objeto impugnar la honradez y veracidad de ese testigo; 3° porque no permitió que declarasen varios testigos que presentó el acusado para probar el mismo hecho que en repreguntas se trató de demostrar con respecto a Cornelio Ayala; y 4°. porque la corte no dejó examinar otros testigos del acusado, presentados para probar que anteriormente al crimen que se perseguía existían enemistades y rencores entre Julio Colón y Don Carlos Torres, por lo que no podía ser cierta la manifestación que el testigo Cornelio Ayala pone en boca del acusado, de que entre él y Julio Colón habían matado a Franchi por orden de Don Carlos Torres; evidencia tendente también a impugnar la veracidad del expresado testigo Ayala.

La moción de nuevo juicio fué negada por la corte, sin que el acusado haya interpuesto recurso de apelación contra dicha negativa y sí únicamente contra la sentencia; pero como los fundamentos de la solicitud de nuevo juicio son las

excepciones tomadas en él, las que conocemos por el pliego que se nos ha presentado, y como esas excepciones sirven de fundamento al recurso de apelación contra la sentencia, resulta de aquí que las cuestiones en que se basa la solicitud de nuevo juicio quedan resueltas al resolver los motivos del recurso contra la sentencia.

A más de las excepciones mencionadas, el recurrente alegó como motivos de error que las instrucciones del juez al jurado fueron insuficientes y que la evidencia no fué bastante para un veredicto de culpabilidad.

Con respecto a la acusación el recurrente no alegó defecto alguno en ella, mas, a pesar de eso, la hemos examinado detenidamente y encontramos que es suficiente.

El motivo alegado por el recurrente de que la evidencia es insuficiente para sostener un veredicto de culpabilidad, hace necesario que hagamos un resumen de ella para venir en conocimiento de si es fundada o nó esa alegación.

De la exposición del caso que tenemos delante al resolver este recurso aparece que la testigo, María Josefa Anciani, que vive en el barrio de Machuelo Arriba testificó haber conocido a Pablo Franchi: que la última vez que lo vió vivo fué el 28 de marzo a las 7 de la tarde a cuya hora salió en su bicicleta con dirección al cine, sin que portara consigo otra arma que una cuchilla de cabo blanco con un ramo punzó, de punta muy aguda, como formando media luna; que entre una y dos de la madrugada del 28 al 29 de marzo lo volvió a ver muerto en la carretera que de Ponce conduce a Juana Díaz antes de llegar a la casa de ella; que fué registrado por el juez y los guardias sin que apareciera la cuchilla mencionada con la que él salió de su casa y la cual no ha vuelto a ver más.

Según la declaración del Doctor López Nussa, Pablo Franchi presentaba un golpe en la cabeza y varias heridas en la espalda, además de otro golpe en la frente: que en la autopsia pudo comprobar que la herida de la cabeza en el lado izquierdo, era como de ocho centímetros de larga, profunda, produjo una fractura en la base del cráneo, que se extendió de la re-

gión temporal hacia adelante por la órbita, teniendo además otra pequeña herida como de uno y medio centímetros de larga y un centímetro de profundidad; herida ésa del cráneo que debió ser producida por un cuerpo contundente como un palo, pudiendo haberlo sido con el que se le presentó en el juicio, y siendo difícil que fuera con una piedra porque ésta hubiera tenido que ser grande, y hubiera producido una depresión en el cráneo, y no tendría entonces el cadáver la herida en forma tan recta. En cuanto a las tres heridas de la espalda, eran de unos tres centímetros de longitud, muy estrechas, corte muy agudo y producidas con un instrumento cortante y punzante, como una cuchilla o algo así.

El Fiscal presentó en el juicio, y sin objeción del acusado, un palo perteneciente a éste, que tenía en uno de sus extremos manchas, las que según la declaración del Dr. Ferrán eran positivamente de sangre y no muy antiguas. Este perito también declaró que dos pequeñas manchas que había reconocido en el pantalón de Alméstico, eran también positivamente de sangre.

Según la declaración del Juez Sr. López Acosta, en la noche del 28 al 29 de marzo acudió al sitio en que estaba en la carretera el cadáver de Pablo Franchi; que registrado el cadáver no se le encontró ninguna cuchilla; que después de haber clareado el día y como a las cinco de la madrugada se investigó por los alrededores y notó que habían algunas pisadas al lado de la carretera y empezando a hacer la investigación por ellos encontró una cuchilla, que es la misma que se le presenta en el juicio y que desde que vió el cadáver hasta que se encontró la cuchilla, no había por el sitio más de cinco o seis personas, y que en la investigación en la que encontró la cuchilla fué acompañado por el Sargento Torres Quintero y otro guardia.

El sargento de la policía, Torres Quintero, confirma el hallazgo de la cuchilla en las condiciones expresadas por el juez.

Deogracias Aguirre, policía insular, también acudió al lugar del suceso y habiéndosele dado en aquellos momentos

una lista para que hiciera investigaciones, figurando en ella el nombre de Juan Alméstico, fué a su casa a detenerlo pero no lo encontró, y al regresar al sitio del suceso lo vió que estaba dentro de una pieza de caña inmediata, deteniéndolo entonces y poniéndose muy nervioso el acusado; que Alméstico empezó a darse paseos por la carretera de la que luego cogió un palo de fósforos con el que empezó a hincarse las encías hasta que se hizo sangre de la que dejó caer una gota en la parte delantera de su traje, diciéndole entonces al testigo: "Aguirre, venga, fíjese que esta gota de sangre que me ha caído es de la boca"; que así era, pero entonces llamó la atención de Alméstico de que detrás del pantalón tenía otra mancha de sangre que no procedía de la boca, a lo que el acusado no le dió explicación.

El policía insular, José R. Monsón, declara sustancialmente lo mismo que el anterior, pero añadió que cuando el acusado mostró a Aguirre la mancha de sangre, le dijo: "Mire, Aguirre, que no vayan luego a decir que esta sangre es de la del muerto."

Juan Alicea, un viejo de sesenta años de edad se levantó esa noche como entre doce y doce y media para ir a su trabajo en la hacienda y entonces vió pasar en su bicicleta a Pablo Franchi y poco después un hombre a pie que resultó ser el comisario a quien el declarante acompañó hasta su casa, siguiendo luego solo su camino durante el que oyó unos pujidos (quejidos) y momentos después sintió que un hombre venía corriendo en dirección hacia él pero quien contuvo la carrera como a ocho o diez pasos de distancia, siendo ese hombre Juan Alméstico a quien conoció perfectamente, quien vestía camiseta negra y portaba un palo; que le cogió miedo porque decían que era muy atrevido y por eso se volvió; pero habiendo encontrado luego a Monserrate García y a Emiliano Rodríguez emprendió de nuevo con ellos el camino que había abandonado; que les dijo que iba a llevar el cuidado de unos pujidos (quejidos) que había sentido por allí y cuando llegaron cerca de unos húcares tropezó Monserrate García con el cadá-

ver de Pablo Franchi, y dijo: "es el señor de Pablo Franchi que ha pasado por delante de nosotros ahorita mismo"; que él, después de esa noche, no ha vuelto a hablar con Emiliano Rodríguez ni con Monserrate García, y que cuando aquella noche se encontraron no les dijo que había sentido un hombre corriendo a caballo y otro a pie, ni tampoco les dijo que se había encontrado con Alméstico.

Monserrate García confirmó en su declaración que él y Emiliano Rodríguez se encontraron en la carretera con Juan Alicea y después de seguir juntos su camino los tres encontraron el cadáver de Franchi. Expresó que Alicea le dijo haber sentido unos pujidos y haber visto una persona a caballo.

Este testigo presentado luego por el acusado como suyo declaró ser peón de Don Carlos Torres y que en la mencionada noche le había dicho Alicea que había visto el celaje de una persona enzapatada a caballo y que habiéndose encontrado en otra ocasión después de esa noche, les preguntó Alicea que si durante ella no se habían encontrado a tres y al contestarle el testigo que a nadie, replicó Alicea: "¡caramba! ¿qué tendría yo esa noche?"

Maximino Rodón manifestó ante el Jurado que Pablo Franchi tenía una tienda a la que el declarante iba muy a menudo: que el sábado anterior al lunes en que murió Franchi vió al acusado por la noche frente a la tienda de Franchi; que Franchi le dijo que se aguardara para salir juntos y mientras el testigo lo esperaba abajo llegó Alméstico con un palo en la mano parecido al que se le enseñó en el juicio y se paró frente a la tienda, creyendo que no vió al declarante porque estaba medio escondido haciendo agua; que habiéndole preguntado si pasaba algo le contestó Alméstico que no y viró para atrás; que al decir a Franchi que Alméstico había estado allí le contestó éste que tenía unos cuantos enemigos.

Eudosia León, una de las dos concubinas del acusado, reconoce como propiedad de éste el palo y una camiseta negra que fueron ocupados en su casa.

Inés Piñero manifestó haber conocido, como propiedad de

Pablo Franchi una cuchilla de cabo blanco con un ramo punzó
la cual vió en casa de Eudosia León concubina del acusado, a
los dos o tres días después de muerto Franchi y llamó la aten-
ción de Eudosia de que aquella cuchilla era de Pablo Franchi.
La cuchilla de cabo blanco a que se refiere tenía la punta más
aguda que la otra cuchilla que se le presentó en el juicio; y
en cuanto a esta última manifestó conocerla porque había sido
suya hasta que la vendió al acusado Alméstico, como un mes
antes de la muerte de Franchi y pocos días antes de morir, és-
ta vió que el acusado aguzaba con ella un lápiz.

El testigó José Franco nada dice de particular.

A más de estos testigos el Fiscal presentó a Cornelio Aya-
la quien dijo ser un detective de la policía y habiéndole mani-
festado el día 30 de marzo el Fiscal que lo necesitaba para la
investigación de un crimen, el Fiscal mandó a buscar al al-
caide de la cárcel quien en ése día lo entró en ella con un traje
de maquinista sucio y una gorra en calidad de preso y fué
colocado en la misma bartolina en que estaba Juan Almés-
tico; que entró en ella lamentándose mucho de la policía y di-
ciendo que lo había golpeado; que luego que se fué el alcaide
de la cárcel le preguntó el acusado de dónde venía a lo que le
contestó que estaba en Aguirre trabajando de maquinista y
le hizo creer al acusado que había tenido hacía unos tres años
una cuestión con Pablo Franchi en la que le dió unos cuantos
golpes por un dinero que le quería cobrar de una cuenta que
no le debía y como ahora habían herido a Franchi lo habían
cogido a él por sospechas como complicado en esa muerte;
que habló muy mal de la policía y así estuvieron en amistad
toda la noche y el día siguiente contándose mutuamente epi-
sodios de su vida; que el acusado nada le dijo entonces con re-
lación al crimen; que a la otra noche el alcaide de la cárcel
lo fué a buscar y lo llevó a la fiscalía y que al regresar de ésta
otra vez a la bartolina dijo al acusado que había estado donde
el Fiscal que llegó hasta él y luego lo mandó salir fuera que-
dándose dentro de la habitación Lespier, el alcaide de la cár-
cel, y el Fiscal y entonces oyó cuando el Fiscal decía al alcaide

que el médico había certificado que la sangre que tenía el pantalón de Alméstico era sangre de cristiano y no de cerdo: que cuando él le dijo eso estaban sentados los dos y de pronto se levantó Alméstico quien le dijo "Amigo, Vd. no sabe lo que yo agradezco eso," preguntándole entonces el testigo "Vd. es Juan Alméstico?" a lo que le contestó él que sí y al replicarle el testigo que la cosa estaba mala replicó Alméstico: "¡Ay amigo! ¿de qué manera me salvaré yo?" Entonces el acusado le dijo que lo ayudara a buscar un abogado y al preguntarle el testigo si creía que así podría salvarse, le contestó Alméstico: "sí, porque yo le cuento la verdad, le cuento el crimen como pasó y él me puede salvar, porque le ofreceré dinero para que se lo dé al médico para que diga que la sangre es de cerdo y así se puede salvar Don Carlito, porque Don Carlito fué el que me mandó." Entonces el testigo le preguntó en qué forma había sucedido eso, si él solo lo había matado, y le contestó que no; que fué entre él y un tal Julio Colón que estaba allí también preso, dándole éste el primer palo y cuando cayó al suelo, él (Alméstico) le dió tres o cuatro puñaladas; que al decirle por qué se había quedado con el pantalón que lo iba a comprometer, le contestó que no se lo había quitado porque creía que no tenía nada; que la camisa era negra y no tenía mancha ninguna y que el cuchillo lo guardó en casa de la querida lo mismo que la camisa y el palo; también le dijo Alméstico a una pregunta del testigo que lo había visto un viejo pero que creía que no podría probar nada; que por el acusado supo que tenía dos concubinas, una de las cuales está recienparida; que había estado desde el sábado en la noche con dos individuos más velando a Franchi; que pudo haberlo matado antes, pues el sábado en la noche había estado con dos individuos más velándolo, pero que no pudo matarlo porque venía con otro más en una calesa y que durante tres noches lo había estado acechando.

Después de estas manifestaciones del acusado al testigo, éste en unión del Fiscal y de la policía, estuvieron en casa de

Eudosia León, concubina de Alméstico, y allí ocuparon un palo y una camiseta negra.

Adolfo Lespier, alcaide de la cárcel de Ponce en aquella fecha, confirmó haber puesto en ella a Cornelio Ayala y en el mismo departamento en que estaba Juan Alméstico.

Esta fué toda la evidencia presentada en este caso por el defensor del Pueblo. La del acusado consistió en las declaraciones de Monserrate García, que ya hemos indicado y la de Eudosia León, habiendo declarado ésta ser una de las dos concubinas del acusado; que cuando mataron a Franchi tenía quince días de parida y que en esa noche se recogió Alméstico en su casa como a las once de la noche; niega que Inés Piñero estuviera en su casa después de la muerte de Franchi y que delante de ella sacara una caja del baúl en la que estaba una cuchilla. Después manifestó no recordar bien si Inés Piñero había estado en su casa antes o después de la muerte de Franchi.

Por último el testigo Antonio Ferrari contestó al Fiscal que en un careo habido entre Inés Piñero y Eudosia León, ésta aceptó que aquélla había estado en su casa dos días después de haber sido muerto Franchi, pero niega que hubiera visto cuchilla alguna.

Basta la simple lectura de los testimonios presentados en este caso al jurado para quedar convencidos de que hay prueba suficiente de la culpabilidad del acusado, así como de que han sido dos las clases de evidencia ofrecidas: una circunstancial o de indicios y la otra de evidencia directa, cuyo carácter tiene la confesión que el acusado hizo al testigo Cornelio Ayala.

Respecto a este último extremo es bueno recordar lo que esta Corte Suprema dijo al resolver el caso de *El Pueblo* v. *Rivera (a) Panchito* que aparece en el tomo 7, D. P. R., 332, y de la cual copiamos lo siguiente:

"El testimonio de los testigos que detalladamente comunicaron al tribunal las confesiones que les había hecho el acusado no puede considerarse como testimonio de referencia, si no que constituye una

prueba directa de los actos del acusado que puede utilizarse contra él en el juicio. Si el acusado deseare excluir las confesiones que se ofrezcan presentar contra él, debía demostrar que están comprendidas en una de las excepciones establecidas por la ley, según la interpretan los autores comentaristas. Esto quiere decir que él debía demostrar que se hallaba bajo coacción, o que obraba bajo la influencia de esperanzas o promesas, que se le habían dado para el caso de que hiciera una confesión.''

Véanse también los siguientes casos en que se reproduce esa doctrina y en los cuales, como en el anterior, se hallan numerosas citas que la sostienen:

*El Pueblo* v. *Eligier,* 9 D. P. R., 396.

*El Pueblo* v. *Dones,* 9 D. P. R., 469.

*El Pueblo* v. *Kent,* 10 D. P. R., 343.

*El Pueblo* v. *Román* (*a*) *Chelo,* 10 D. P. R., 561.

*El Pueblo* v. *Hernández,* 14 D. P. R., 225.

*El Pueblo* v. *Morales* (*a*) *Yare Yare,* 14 D. P. R., 234.

De acuerdo pues, con la doctrina sentada en esta jurisprudencia, hemos de estimar como evidencia directa la confesión hecha por el acusado a Cornelio Ayala, siempre que haya sido voluntaria y libremente hecha.

En este caso no se ofreció por el representante del Pueblo evidencia alguna de que tal confesión fué hecha libre y voluntariamente por Juan Roméstico, esto es, sin que fuera debida a amenazas, temor o inducido a ello por cualquier otro medio impropio, pero a pesar de no haberse practicado esa prueba por el Fiscal, el acusado no hizo objeción a que el testigo Cornelio Ayala relatara las manifestaciones que ponía en boca del acusado ni éste tampoco ha presentado evidencia de ninguna clase que tienda a demostrar que tales manifestaciones no fueran voluntarias y libres. A pesar de ser esto así, tal circunstancia no quita valor alguno a la declaración de Cornelio Ayala, porque aun en los Estados en donde esa prueba se exige previamente sino se practica y se admite la confesión sin la objeción del acusado, se supone que si no impugnó fué

porque fué hecha libre y voluntariamente, a menos que lo contrario aparezca de la propia declaración del testigo.

*State* v. *Madison,* 47 La. Ann., 30.

*State* v. *Davis,* 34 La. Ann, 351.

*People* v. *Barker,* 60 Mich., 277.

Además, de la declaración de Cornelio Ayala se ve que la confesión del acusado fué voluntaria y libre pues se produjo espontáneamente al manifestarle que había oído decir al Fiscal que eran de sangre humana las manchas del pantalón de Juan Aléstico, y no mediaron amenazas ni ofertas que por otra parte no era presumible que hiciera Ayala ni que pudiera creer Aléstico, en vista de que conversaba con una persona que aparecía ser un maquinista preso como presunto responsable de un delito.

Es cierto que Cornelio Ayala obtuvo la confesión del acusado debido al engaño de decirle que eran de sangre humana las manchas de un pantalón ocupado a Juan Aléstico, pero ésta falta o simulación no era de tal naturaleza que privara al acusado de su libertad y voluntariedad para hacer o nó la confesión de su delito. El hecho de que un policía, detective o cualquiera otra persona obtenga una confesión mediante engaño, no es por sí solo bastante para hacer inadmisible esa evidencia.

*Borton* v. *State,* 107 Ala., 108; 18 So., 284.

*Stone* v. *State,* 105 Ala., 60; 17 So., 114.

*King* v. *State,* 40 Ala., 314.

Wigmore on Evidence, Sec. 841.

La prueba de confesión, que es directa, ha sido corroborada sin embargo, en este caso. Así vemos que el particular confesado por Aléstico de que por dos o tres noches antes del crimen había acechado a Pablo Franchi, resulta comprobado por el testigo Rodón; el que fué visto por un viejo en los momentos del crimen, lo justificó Juan Alicea; el hecho de que tenía dos concubinas una de ellas recién parida lo acreditó Eudosia León; que la noche del suceso vestía una camiseta negra, también lo comprobó Alicea; la manifestación

de que esa camiseta y el palo que portaba la mencionada noche estaban en la casa de Eudosia León, lo atestiguó ésta y el hecho de ser encontrados en la casa de ella.

Pero independientemente de esa evidencia directa y corroborada en este caso, existió otra circunstancial o de indicios, tal como la de que al saber Franchi en la noche del sábado que había estado por su tienda Juan Alméstico solamente contestara que tenía algunos enemigos; que el acusado fuera visto en los mismos momentos en que el crimen ocurrió, que corría por la carretera y por sitio inmediato a aquel en donde el crimen tuvo lugar; que una cuchilla perteneciente al acusado fuera encontrada cerca del cadáver; que otra que aquella noche llevaba encima Pablo Franchi no se le encontrara al ser hallado muerto, pero sí fué vista en casa de una de las concubinas del acusado, dos o tres días después de haber ocurrido el crimen; que un palo perteneciente al acusado tuviera manchas que positivamente eran de sangre, ocurriendo lo mismo con las dos manchas que tenía el pantalón del acusado al ser detenido.

Estos indicios que son útiles porque conducen a demostrar la culpabilidad del acusado excluyendo cualquiera otro, y la prueba de confesión que ha sido presentada, son suficientes para poder llegar a la conclusión de que el acusado fué quien produjo la muerte de Pablo Franchi en la manera ilegal y violenta que relata la acusación y para que esté sostenido el veredicto del jurado, ya que de esa evidencia resultan las circunstancias esenciales del delito de asesinato en primer grado.

Nuestro Código Penal expresa que es asesinato el dar muerte ilegal a un ser humano con malicia y premeditación; que todo asesinato perpetrado por medio de veneno, acecho o tortura y toda clase de muerte voluntaria deliberada y premeditada o cometida al perpetrarse o intentarse algún incendio de morada, violación, robo, asalto o mutilación, constituye un delito de asesinato en primer grado.

Existen pues, tres clases de asesinato en primer grado:

el que se perpetra por medio de acecho, veneno o tortura; el que ocurre al cometer o intentar cometer delito de incendio, violación robo o mutilación; y el perpetrado en cualquier otra forma voluntaria, deliberada y premeditada.

El presente caso está comprendido en la primera clasificación porque, según la propia confesión del acusado, estuvo acechando por dos o tres noches al interfecto, y estando esto justificado y habiendo causado la muerte en esas circunstancias, no era necesario presentar otras pruebas de deliberación y premeditación para que pudiera el delito calificarse de asesinato en primer grado.

Sostiene el recurrente que la corte inferior no instruyó al jurado respecto del delito de homicidio y que por eso incurrió en error.

Es cierto que tal instrucción no se dió al jurado, pero a pesar de ello la corte inferior no cometió error alguno porque en la evidencia nada había que pudiera justificar un homicidio y en tal caso el juez no debe dar instrucciones respecto al grado inferior del delito acusado, cuando no hay nada en la evidencia que pudiera justificar el que el delito se rebajara a ese grado.

Blashfield Instructions to Juries, Vol. 1, Secciones 86 y 190.

Wharton on Homicide, Secciones 158-160.

En el caso de *Sparf and Hausen* v. *United States,* 156 U. S., 51, dijo el Tribunal Supremo de los Estados Unidos, lo siguiente:

"Las peticiones que hicieron los acusados a la corte sobre instrucciones al jurado se fundaban en la sección 1035 de los Estatutos Revisados de los Estados Unidos, que prescribe que 'en todas las causas criminales puede declararse culpable al acusado de cualquier delito cuya comisión esté necesariamente incluída en aquel que se le imputa en la acusación, o puede ser declarado culpable de tentativa de cometer el delito que se le imputa a no ser que tal tentativa constituya por sí sola un delito.'

"La negativa de la corte a conceder las instrucciones solicitadas por los acusados, considerada en relación con cierta parte de las instruc-

ciones dadas al jurado con respecto al delito de homicidio, así como las apreciaciones de la corte al solicitar el jurado por medio de su presidente que se le dieran más instrucciones, presentan la cuestión de si la corte se excedió en sus facultades al expresar, como efectivamente expresó, que en vista de la prueba practicada el único veredicto que de acuerdo con la ley podía emitir el jurado, era o el de encontrar al acusado culpable del delito imputádole, o no culpable de dicho delito; que si se hubiera cometido un homicidio voluntario por cualquiera de los acusados, siendo los jurados los jueces acerca de la prueba, en el presente caso no existía motivo que justificara el rebajar el delito a un grado inferior al de asesinato; y que, 'siendo el jurado uno de los tribunales del país, debe estar regido por la ley, y ésta debe recibirla de la corte.'

"La corte inferior consideró correctamente que la sección 1035 de los Estatutos Revisados no autorizaba al jurado en un caso criminal a declarar a un acusado culpable de un delito de grado inferior al que se le imputa en la acusación, a menos que tal veredicto esté justificado por la prueba. El Congreso no tuvo la intención de investir al jurado de una facultad por la que pueda arbitrariamente hacer caso omiso de la prueba y de los principios de ley que son aplicables al presente caso. El único fin de esa sección fué el de colocar al jurado en condiciones en el caso de que resultara que el acusado no era culpable del delito específico que se le imputaba, y si la prueba lo permitía, de declararlo culpable de un delito de grado inferior que estuviera necesariamente comprendido en el que se le había imputado, o del delito de tentativa de cometer el que se le imputó. Examinando minuciosamente la prueba, no encontramos en ella motivo alguno por el cual el jurado llegara debidamente a la conclusión de que el acusado Hansen solamente era culpable de un delito comprendido en el que se le imputaba, o de una simple tentativa de cometer el delito imputádole. Un veredicto de culpable de un delito de grado inferior al imputado, hubiera sido uno en completo desacuerdo con toda la prueba, infringiendo así el jurado la obligación que tiene de emitir un veredicto justo. Faltaba por completo prueba en la que pudiera fundarse un veredicto de culpable de homicido o de simple acometimiento. Dictando un veredicto de esa clase el jurado ejercitaría la facultad de conmutar el castigo correspondiente a un delito realmente cometido por otro distinto de aquel que la ley prescribe."

Aplicando esa doctrina al presente caso, decimos que no hay en este caso evidencia alguna que pudiera justificar un veredicto de homicidio, por lo que el juez no tenía que dar

instrucciones de este delito al jurado y por tanto no cometió el error que se le atribuye.

Los errores que nos resta examinar son los que también servían de motivo para la moción de nuevo juicio, siendo el primero de ellos que la corte no debió permitir que fueran examinados, a pesar de la protesta del acusado, ciertos testigos presentados por el Fiscal en el juicio, y que no figuraban al dorso de la acusación.

Respecto de este particular, para demostrar que no existe el error alegado, nos bastará reproducir lo que resolviendo igual cuestión hemos dicho en el caso del *Pueblo* v. *Román,* resuelto en 8 del presente mes:

"Con referencia a la cuestión de que se incluyan los nombres de los testigos de la acusación, no hay precepto legal alguno que de modo imperativo exija al fiscal que haga una relación de todos los testigos que conoce. Es bastante con que mencione aquellos que él ha examinado con el fin de presentar la acusación. En algunos estados es un requisito legal imperativo que se acompañe una relación de todos los testigos, pero no sucede así en California de donde procede nuestra jurisprudencia (*People* v. *Symonds,* 22 Cal., 349; *People* v. *Jocelyn,* 29 Cal., 564; *El Pueblo* v. *Kent,* tomo 10, D. P. R., pág. 343.) Aunque no existió ningún error técnico, si resultara sin embargo que el acusado en realidad fué sorprendido por haberse presentado algunos testigos cuyos nombres no habían sido incluídos en la acusación, el dejar de mencionar dichos testigos es una cuestión a la que siempre debe dársele gran consideración al determinar si la corte abusó o nó de su discreción al negar la suspensión del juicio, para que el acusado tuviera oportunidad de presentar su prueba contradictoria."

Los otros tres motivos de error basados en las tres restantes excepciones tomadas por el acusado según aparecen en pliego que de ellas formuló y fué aprobado por el juez, han sido tratados conjuntamente por el recurrente y podemos hacer nosotros lo mismo porque descansan en el mismo fundamento.

La Corte de Distrito no permitió que el testigo Cornelio Ayala contestara a ciertas represuntas del acusado, con las que trataba de demostrar que dos o tres años antes fingién-

dose maquinista dicho testigo, siendo detective en Ponce, invitaba a distintas personas para que jugasen y luego de conseguirlo y de ganerles el dinero los denunciaba o mandaba recado a otros policías para que sorprendieran la jugada, habiendo sido dos veces el testigo procesado por ese hecho.

Este mismo hecho trató de probarlo el acusado presentando diversos testigos, sin que la corte permitiera tampoco esa clase de evidencia.

Asimismo presentó testigos para justificar que con bastante anterioridad a la muerte de Franchi era Julio Colón enemigo de Don Carlos Torres, con motivo de haberse negado éste a reconocer un hijo ilegítimo que según Julio Colón tuvo una cuñada suya con Torres. Esta evidencia no fué permitida por la corte y el acusado tomó excepción como hizo con las anteriores.

Por esos tres medios trataba el acusado de impugnar la declaración de Cornelio Ayala.

La presunción establecida en la ley de que todo testigo dice la verdad es *juris tantum* y por consiguiente puede ser rechazada por la forma en que declaró, por el carácter de su declaración o por evidencia que afecte a su veracidad, honradez, integridad o móviles, o por evidencia contradictoria; la parte contra quien se presente un testigo podrá tacharlo mediante evidencia contradictoria, o de que su reputación en cuanto a veracidad, honradez e integridad es generalmente mala, pero no con evidencia de determinados actos reprobables, salvo el que fué convicto de delito grave, lo que podrá probarse mediante el examen del testigo o por la anotación de la sentencia. También podrá tacharse al testigo con evidencia de que en otras ocasiones hizo manifestaciones incompatibles con la que hace en el juicio.

Tales son las reglas consignadas en la Ley de Evidencia mediante las cuales puede tacharse o impugnarse a un testigo, y de acuerdo con ellas la corte no cometió error al rechazar esas clases de evidencia.

La ley no quiere que la presunción de veracidad de un

testigo se ataque con prueba de *determinados* actos más o menos reprochables, sino que exige la prueba de que su reputación es *generalmente* mala en cuanto a veracidad, honradez o integridad, o por prueba de convicción de algún delito grave.

*People* v. *O'Brien,* 96 Cal., 171.

*Evans* v. *DeLay,* 81 Cal., 103.

*Jones* v. *Duchow,* 87 Cal., 109.

*Barkly* v. *Capeland,* 86 Cal., 483.

*Sharon* v. *Sharon,* 79 Cal., 633.

El acusado no trataba de probar que la reputación *general* del testigo Ayala era mala, sino que intentó probar actos *determinados* que estimaba reprochables y también cierto disgusto entre dos personas a quienes el acusado por boca del testigo atribuye alguna participación en el crimen, pero tal clase de evidencia no siendo de mala reputación general era inadmisible para atacar la credibilidad del testigo Ayala, por lo que la corte no cometió error al desestimarla.

Hemos examinado y resuelto todos los motivos del recurso, y habiendo también considerado detenidamente la transcripción de los autos y los pliegos de excepciones y de exposición de hechos, no encontramos que se haya cometido error alguno fundamental, por lo que la sentencia debe ser confirmada.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados MacLeary, Wolf y del Toro.